Molly Tack-Hooper, OSB #212147
mtackhooper@earthjustice.org
Earthjustice
810 3rd Ave, Suite 610
Seattle, WA 98104
(206) 343-7340

*Counsel for Plaintiffs Western Watersheds
Project and WildEarth Guardians*

Thomas Delehanty *(pro hac vice forthcoming)*
Michael S. Freeman *(pro hac vice forthcoming)*
tdelehanty@earthjustice.org
mfreeman@earthjustice.org
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
(303) 623-9466

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT and WILDEARTH GUARDIANS, | Case No.: |
| Plaintiffs, | |
| v. | COMPLAINT |
| U.S. FISH AND WILDLIFE SERVICE; BRIAN NESVIK, in his official capacity as Director for the U.S. Fish and Wildlife Service; and DOUG BURGUM, in his official capacity as Secretary of the Interior, | |
| Defendants. | |

**INTRODUCTION**

1.      Plaintiffs Western Watersheds Project and WildEarth Guardians challenge the U.S. Fish and Wildlife Service's failure to issue a finding on their March 6, 2023 petition to list the pygmy rabbit as threatened or endangered under the Endangered Species Act ('ESA') within the 12-month period required by law.  16 U.S.C. § 1533(b)(3)(B).

Complaint                                    1



*Photo credit: Morgan Heim*

2.      The ESA sets out a nondiscretionary timeline for the Service to make the now-overdue finding, and the Service's failure to meet that deadline delays crucial protections for the pygmy rabbit, increasing its risk of extinction.

3.      Plaintiffs bring this lawsuit for declaratory and injunctive relief, seeking an order declaring that the Service violated the ESA by failing to timely issue the required 12-month finding, and directing the Service to issue that finding by a date certain.

## JURISDICTION

4.      This Court has jurisdiction over this action pursuant to 16 U.S.C. § 1540(c), (g) (ESA citizen suit provision), which waives the Defendants' sovereign immunity, and 28 U.S.C. § 1331 (federal question).  This Court has authority to issue declaratory and injunctive relief.  16 U.S.C. § 1540(g); 28 U.S.C. §§ 2201–2202; 5 U.S.C. § 706.

5.      Plaintiffs provided Defendants with 60 days' notice of the ESA violation alleged in this complaint, as required by 16 U.S.C. § 1540(g)(2)(C), by a letter to the Service dated August 14, 2024.  The Defendants have not remedied the violations set out in the notice, and an actual controversy exists between the parties.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e)(1).  Plaintiffs have offices, staff, and members located in this judicial district, and "a substantial part of the events or omissions giving rise to the claim occurred" in this district, *id.*, because (1) the Service's failure to issue a timely listing decision involves the agency's Pacific Regional Office, which is based in Portland, Oregon; and (2) that failure "adversely impacts" an ecologically important population of pygmy rabbits present in central and southeastern Oregon, *WildEarth Guardians v. U.S. Dep't of Just.*, No. 13-cv-00392, 2014 WL 12539913, at *3–4 (D. Ariz. Aug. 12, 2014).

7.      Venue is also proper in this Court under the ESA's venue provision, which allows an ESA claim to be brought "in the judicial district in which the violation occurs."  16 U.S.C. § 1540(g)(3)(A); *see Nw. Forest Res. Council v. Babbitt*, No. 93-cv-01579, 1994 WL 908586, at *2 (D.D.C. Apr. 13, 1994) (explaining that this provision "expands the scope of permissible venues available for an ESA citizen suit").  As noted, the Defendants' failure to issue a timely listing decision involves U.S. Fish and Wildlife Service personnel within Oregon and affects pygmy rabbits present in Oregon, meaning that the violation occurred within this judicial district. *See WildEarth*, 2014 WL 12539913, at *4.

8.      This case should be assigned to the Court's Eugene Division because pygmy rabbits occupy, and Plaintiffs have members and staff in, Deschutes County.

**PARTIES**

9.      Defendant U.S. FISH AND WILDLIFE SERVICE is the agency within the Department of the Interior charged with implementing the ESA for terrestrial species like the

Complaint                                                  3

pygmy rabbit. The Secretary of the Interior has delegated administration of the ESA to the U.S. Fish and Wildlife Service. 50 C.F.R. § 402.01(b).

10. Defendant BRIAN NESVIK is the Director of the U.S. Fish and Wildlife Service and is charged with ensuring that agency decisions comply with the ESA. Defendant Nesvik is sued in his official capacity.

11. Defendant DOUG BURGUM is the Secretary of the U.S. Department of the Interior and has the ultimate responsibility to administer and implement the relevant provisions of the ESA. Defendant Burgum is sued in his official capacity.

12. The three defendants listed above are collectively referred to in the remainder of this complaint as "the Service."

13. Plaintiff WESTERN WATERSHEDS PROJECT ('WWP'), is a non-profit membership organization with offices throughout the West, including in Sisters, Oregon and Jacksonville, Oregon. WWP has over 50,000 members and supporters including many who reside and routinely recreate in parts of Oregon occupied by pygmy rabbits. WWP, its staff, members, and supporters are dedicated to protecting and conserving the public lands, wildlife, and natural resources of watersheds in the West. WWP, its staff, members, and supporters are dedicated to ensuring the long-term survival and recovery of pygmy rabbits and their sagebrush habitats. WWP brings this action on behalf of itself, its members, and its supporters. This action furthers the organizational goals and interests of WWP and its members and supporters.

14. Plaintiff WILDEARTH GUARDIANS ('Guardians') is a nonprofit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians' Sagebrush Sea Campaign focuses on the conservation of sagebrush landscapes and the imperiled species that depend on them across the West,

Complaint                                     4

including the pygmy rabbit. Guardians has a major office in Portland, Oregon, and it has over 209,000 members and supporters nationwide, many of whom have strong interests in conserving pygmy rabbit populations and their sagebrush habitats, particularly on public lands.

16. Plaintiffs bring this action on behalf of their staff and members who derive ecological, recreational, aesthetic, educational, scientific, professional, and other benefits from these species and their habitats. As a multitude of threats continue to push the pygmy rabbit toward extinction, Plaintiff members' interests in protecting and recovering the species and its habitat are directly harmed by the Service's failure to issue timely findings. These interests and harms are described in the affidavits submitted with this complaint as **Exhibits A–C**.

16. For example, Western Watersheds Project member Mark Salvo has devoted his career to protecting and restoring desert ecosystems and wildlife, including the pygmy rabbit. **Exhibit A**, Declaration of Mark N. Salvo ¶ 3. He has worked for decades to advance stronger protections for the pygmy rabbit and its sagebrush steppe ecosystem by participating in collaborative meetings and field work, writing and speaking publicly about threats to sagebrush ecosystems and wildlife, helping "brand" and communicate the importance of sagebrush country, and serving as a spokesperson to the news media. *Id.* ¶ 7. Mr. Salvo frequently visits pygmy rabbit habitat in southeastern Oregon, including in the Hart Mountain National Antelope Refuge, where he helped restore native vegetation after a severe wildfire. *Id.* ¶¶ 9–11. Mr. Salvo has personally observed and studied how "sagebrush steppe landscapes are undergoing rapid change from invasive species, wildfire, and climate-related stressors," reducing his ability to enjoy an ecosystem he has dedicated his career to protecting. *Id.* ¶ 19.

17. Similarly, Western Watersheds Project member and Oregon State Director Adam Bronstein frequently visits parts of southeastern Oregon with high-quality pygmy rabbit habitat,

Complaint                                            5

and he found a burrow and droppings as recently as May 19, 2025. **Exhibit B**, Declaration of Adam Bronstein ¶¶ 3, 14. Mr. Bronstein regularly incorporates pygmy rabbits into his advocacy work by identifying and seeking to minimize impacts on the species when evaluating proposals that might degrade big sagebrush habitat, with particular concern for grazing management. *Id.* ¶¶ 9, 15, 18–19. The lack of federal ESA protection for the pygmy rabbit allows grazing and other threats to persist, impairing Mr. Bronstein's ability to enjoy intact big sagebrush habitat. *Id.* ¶¶ 26–30.

18. WildEarth Guardians' Endangered Species Advocate, Joanna Zhang, has worked for years advocating for the protection of large, intact sagebrush landscapes from livestock grazing, invasive grasses, juniper expansion, wildfire, and habitat fragmentation. **Exhibit C**, Declaration of Joanna Zhang ¶¶ 3, 8. These landscapes include the Hart Mountain National Antelope Refuge in Oregon and Sheldon National Wildlife Refuge in Nevada. *Id.* ¶ 8. Ms. Zhang recreates, conducts fieldwork, and looks for pygmy rabbits on public land in central Oregon, Malheur National Wildlife Refuge, and the Owyhee Canyonlands of southeastern Oregon. *Id.* ¶ 9. The ongoing lack of ESA protection compounds the threats facing the species, reducing the likelihood that she will be able to see and enjoy pygmy rabbits in the wild. *Id.* ¶ 10.

19. The Service's violation of the ESA's nondiscretionary mandatory deadline for a finding on Plaintiffs' petition has delayed ESA protections for the pygmy rabbit. That delay harms Plaintiff members' interests in the species by decreasing the likelihood that these members will encounter the species as part of their personal and professional excursions. It also impairs the ecological health and natural character of the sagebrush-steppe ecosystems of which pygmy rabbits are a part and which Plaintiffs' members use and enjoy for recreation, solace, and connection to the natural world.

Complaint                                      6

20.     These injuries are actual, concrete, and presently suffered by Plaintiffs' members; are directly caused by Defendants' acts and omissions; and will continue unless the Court grants relief.  The relief sought would redress these injuries by providing a concrete, enforceable timeline for the Service to make a listing decision, resulting in the application of ESA protections or, potentially, denial of ESA protections, which Plaintiffs could challenge in court as final agency action.  The Service's current, open-ended inaction provides neither the benefit of listing nor the certainty of a denial, necessitating this Court's involvement.  Plaintiffs and their members have no other adequate remedy at law.

## STATUTORY FRAMEWORK

21.     The Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  Its fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species."  16 U.S.C. § 1531(b).

22.     The ESA has a suite of substantive and procedural legal protections that apply to species once they are listed as endangered or threatened.  For example, Section 4 of the ESA requires the Service to designate "critical habitat" for each endangered and threatened species. *Id.* § 1533(a)(3).  Section 7 requires all federal agencies to ensure that their actions do not "jeopardize the continued existence" of any endangered or threatened species or "result in the destruction or adverse modification" of any listed species' critical habitat.  *Id.* §1536(a)(2). Section 9 prohibits "any person" from causing the "take"—i.e., killing, injuring, harming, etc.— of any ESA-protected fish or wildlife without lawful authorization from the Service.  *Id.* §§ 1538(a)(1), 1539; *see also id.* § 1532(19) (defining "take").  Other provisions require the Service

Complaint                                          7

to "develop and implement" recovery plans for listed species, *id.* § 1533(f); authorize the Service to acquire land for the protection of listed species, *id.* § 1534; and authorize the Service to make federal funds available to states to assist in the conservation of endangered and threatened species, *id.* § 1535(d).

23.     The ESA defines a "species" as "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16). A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

24.     The ESA requires the Service to determine whether any species is endangered or threatened based on:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1).

25.     To ensure the timely protection of species at risk of extinction, Congress set forth a detailed process whereby interested persons may petition the Service to list a species as endangered or threatened. *Id.* § 1533(b)(3). In response, the Service must publish a series of three decisions according to strict statutory deadlines.

26.     First, within 90 days of receipt of a listing petition, the Service must, "[t]o the maximum extent practicable," publish an initial finding "as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be

Complaint                                        8

warranted." *Id.* § 1533(b)(3)(A).  This is known as the '90-day finding.'  If the Service finds in the 90-day finding that the petition does not present substantial information indicating that listing may be warranted, the petition is rejected and the process concludes.  If the Service determines that a petition presents substantial information indicating that listing "may be warranted," *id.*, the agency must publish that finding and proceed with a scientific review of the species' status, known as a 'status review.'

27.    Second, upon completing the status review, and within 12 months of receiving the petition, the Service must publish a "12-month finding" with one of three listing determinations: (1) listing is "not warranted"; (2) listing is "warranted"; or (3) listing is "warranted but precluded" by other proposals for listing species, provided certain circumstances are met.  *Id.* § 1533(b)(3)(B).  This is known as the '12-month finding.'  If the Service determines that listing is warranted (and not precluded by other listing priorities), the agency must publish that finding in the Federal Register along with the text of a proposed regulation to list the species as endangered or threatened and take public comments on the proposed listing rule.  *Id.* § 1533(b)(3)(B)(ii).

28.    Third, within one year of publication of the proposed listing rule, the Service must publish in the Federal Register the final rule implementing its determination to list the species. *Id.* § 1533(b)(6)(A).  This is known as a 'final listing rule.'

## FACTUAL BACKGROUND

### I.    PYGMY RABBIT

29.    The pygmy rabbit (*Brachylagus idahoensis*) is the smallest rabbit in North America and one of the few rabbit species that regularly digs its own burrows, a behavior tightly linked to deep, soft soils beneath mature sagebrush stands.  It is a sagebrush obligate and across much of its range it depends on big sagebrush (*Artemisia tridentata*) for both cover and food, especially in winter when sagebrush can dominate its diet.  Pygmy rabbits are sometimes

Complaint                                9

considered arboreal because they climb high into the canopies of old-growth sagebrush to forage on leaves and buds.  Historically and currently, the species occurs in the sagebrush steppe and shrublands of the northern Great Basin and adjacent Intermountain West, including parts of Oregon, Idaho, Nevada, Montana, Utah, Wyoming, California, and Washington, where occupancy is strongly associated with tall, dense sagebrush, relatively low tree cover, and deep soils suitable for burrowing.



*Photo credit: J. Witham*

30.     Because it requires large, intact sagebrush structure and disappears quickly when that structure is degraded, the pygmy rabbit is an indicator of high-quality sagebrush-steppe ecological conditions.  Its presence can signal landscapes with the shrub canopy, understory, and soil attributes that many other sagebrush-dependent species also need.

31.     Habitat loss, degradation, and fragmentation of sagebrush steppe are pushing pygmy rabbits toward extirpation in significant portions of their range.  Conversion of shrublands to cropland or irrigated agriculture, subdivision/exurban growth, and road networks can eliminate, fragment, or isolate the deep-soil sagebrush patches that support burrowing colonies, reducing habitat quality and dispersal between populations.  Fragmentation is especially consequential for a small, burrow-centered animal like the pygmy rabbit because, when suitable patches are separated by unsuitable habitat, colonies may become ecologically isolated, making them more vulnerable to local disturbances or other unexpected events and slowing recolonization after disturbance.

32.     Large, frequent wildfires—fueled by invasive annual grasses (e.g., cheatgrass) and compounded by warming temperatures and drought—are another major threat to the species. Sagebrush is not well-adapted to rapid post-fire recovery, so when extensive burns remove shrub cover across large blocks, pygmy rabbits can lose both forage and concealment over large areas of their habitat.  Recolonization can be slow because sagebrush stands may take decades to return to pre-fire form.  In many places, increased dominance by invasive grasses creates a self-reinforcing grass–fire cycle, effectively converting shrublands to persistent annual grasslands with far lower suitability for pygmy rabbits and further isolating the small populations that persist in unburned areas.

Complaint                                          11

33.    Domestic livestock grazing and other human uses, without proper management, can significantly degrade pygmy rabbit habitat too.  Cattle crush burrows, trample and destroy big sagebrush, and remove or reduce the native grasses and forbs that pygmy rabbits use for forage and concealment, while also disturbing soils and spreading invasive plants that further degrade habitat.  Associated range 'restoration' on public lands—destroying big sagebrush habitat to make room for vegetation more favored by cattle, for example—directly degrade the habitat the species relies on.  Similarly, off-highway vehicle (OHV) use—especially when vehicles leave designated routes—causes localized but severe soil disturbance, increases erosion, creates new informal roads, and facilitates weed spread.  Transmission lines, roads, and utility corridors fragment sagebrush blocks, increase human access, and can accelerate invasive species spread and wildfire ignitions.  Oil-and-gas development and other mineral development can eliminate habitat outright and contribute to large-scale fragmentation and disturbance that isolate pygmy rabbit populations.

34.    These threats are often cumulative and mutually reinforcing.  Grazing, vehicle traffic, and infrastructure increase disturbance and invasion risk, invasive annual grasses promote more frequent and intense fires, and repeated fires can convert sagebrush steppe to annual grassland—resulting in progressive loss of the mature, connected, big sagebrush habitat needed for pygmy rabbit survival and recovery.

35.    Existing laws and regulations do not protect pygmy rabbits at the scale and enforceability they need.  ESA coverage to date has been limited to the Columbia Basin population in Washington.  The remainder of the species' range has not had the benefit of ESA protections like prohibitions on take, mandatory recovery planning, inter-agency consultation on federally approved projects, or enforceable habitat protections.  These shortcomings leave large

Complaint                                    12

portions of occupied and potential habitat for pygmy rabbits governed primarily by general land-use statutes and discretionary agency policies.  On the extensive federal lands where much sagebrush steppe occurs, these discretionary policies often allow grazing, energy development, rights-of-way, and vegetation manipulation that, together, significantly reduce sagebrush habitat.

36.    Absent ESA listing, management for pygmy rabbits is often framed by the responsible agencies as nonbinding "special status" consideration rather than a mandatory duty to maintain or restore habitat connectivity and critical patches of habitat.  The result is a regulatory gap: protections tend to be, at best, piecemeal, population-specific, and discretionary, while the dominant threats—landscape fragmentation and the invasive grass–fire cycle—operate at broad scales.  The ESA's coordinated, enforceable standards are needed to establish and organize conservation efforts more effectively and keep the pygmy rabbit from extinction.

## II.    LISTING PETITION AND RESPONSE

37.    Recognizing the threats described above, on March 6, 2023, Plaintiffs submitted a petition to the Service requesting that the pygmy rabbit be listed as threatened or endangered under the ESA.

38.    On January 25, 2024, the Service issued a positive 90-day finding on that petition, concluding that the petition presented substantial information indicating that listing the pygmy rabbit may be warranted.  The Service made that finding based on "readily available information regarding the compound effects of fire, cheatgrass, and climate change," as well as information presented in the petition "suggesting livestock grazing, oil and gas development, and disease may be threats to the pygmy rabbit."  89 Fed. Reg. 4884, 4888 (Jan. 25, 2024).

39.    Because the Service found the petitioned action may be warranted, its 12-month finding was due one year after receipt of the petition, on March 6, 2024.  16 U.S.C. §

Complaint                                        13

1533(b)(3)(B).  However, the Service has not yet made a 12-month finding, and it is thus past due.

40.    Until the Service issues the statutorily overdue 12-month finding, the pygmy rabbit will continue to lack necessary protections under the ESA, contributing to its decline.

## CLAIM FOR RELIEF
### *Failure to Make Mandatory 12-Month Listing Decision, 16 U.S.C. § 1533(b)(3)(B)*

41.    Plaintiffs re-allege and incorporate all allegations set forth in the preceding paragraphs.

42.    The ESA requires the Service to publish a 12-month finding within 12 months of receiving a petition to list a species under the Act, when it has made a 90-day finding that listing may be warranted.  The Service failed to do so for Plaintiffs' March 6, 2023 listing petition for the pygmy rabbit.  At the time of filing this complaint, over three years have passed since the petition was submitted, and the Service has yet to fulfill its nondiscretionary duty to publish the required 12-month finding, in violation of the ESA.  16 U.S.C. § 1533(b)(3)(B).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment providing the following relief:

1.    declare that the Service violated the ESA by failing to issue a timely 12-month listing determination in response to Plaintiffs' petition to list the pygmy rabbit;

2.    provide injunctive relief compelling the Service to issue the 12-month finding by a date certain;

3.    retain continuing jurisdiction to review the Service's compliance with all judgments and orders issued in this case;

Complaint                                14

4.      grant Plaintiffs their reasonable attorneys' fees and costs as provided by the ESA,

16 U.S.C. § 1540(g)(4); and

5.      provide such other relief as the Court deems just and proper.


Respectfully submitted May 13, 2026.

*/s/ Molly Tack-Hooper*
Molly Tack-Hooper, OSB #212147
mtackhooper@earthjustice.org
Earthjustice
810 3rd Ave, Suite 610
Seattle, WA 98104
Phone: (206) 343-7340
Fax: (415) 217-2040

Thomas Delehanty *(pro hac vice forthcoming)*
Michael S. Freeman *(pro hac vice forthcoming)*
tdelehanty@earthjustice.org
mfreeman@earthjustice.org
Earthjustice
1125 17th Street, Suite 1010
Denver, CO 80202
Phone: (303) 623-9466
Fax: (303) 623-8083